**Affirmed and Opinion filed December 20, 2018.**



In the

# Fourteenth Court of Appeals

### NO. 14-17-00595-CR

**SHERRICK WASHINGTON, Appellant**

v.

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 208th District Court
Harris County, Texas
Trial Court Cause No. 1540170**

## O P I N I O N

Appellant Sherrick Washington challenges his conviction for the capital murder of his girlfriend's five-year-old son. *See* Tex. Penal Code §§ 19.02(b)(1), 19.03(a)(8) (West 2017). Appellant raises seven issues on appeal. He argues the evidence is legally insufficient to support that he intentionally or knowingly caused the death of Amarie; the trial court abused its discretion by permitting the introduction of statements appellant's girlfriend made to police; the admission of

such evidence violated appellant's rights under the Confrontation Clause; the trial court abused its discretion by permitting the introduction of appellant's girlfriend's statement, "Don't hurt him," during a phone call with appellant; the trial court denied appellant his constitutional right to present a complete defense by excluding evidence that his girlfriend was an alternate perpetrator; the trial court abused its discretion by not permitting certain testimony by appellant's mother; and the trial court erred by instructing the jury on the law of parties because there is insufficient evidence that appellant was guilty as the principal or as a party. We affirm.

## I.   BACKGROUND

Appellant and his girlfriend Brandi Howard broke up around April 18, 2015. Howard had a five-year-old son, complainant Amarie Daniels. In a text message sent on April 22, 2015, appellant told Howard that he broke up with her because "stayin there wit ya kid is dangerous for me." Approximately a week and a half later, appellant and Howard were back together; and appellant was staying with Howard and Amarie at their new apartment.

According to Howard, about 3:00 p.m. on the afternoon of Saturday, May 2, 2015, Amarie went outside to play. At approximately 3:23 p.m., Howard received a phone call from her ex-husband, Donnell Hunter. During the call, a male voice could be heard yelling in the background as Hunter stated, "Man, I don't care about you." Howard told Hunter to stop calling her and that he was "making things look bad on [her] part." According to appellant, he was aware of this phone call and it did not bother him.

Appellant left Howard's apartment to visit his father and to watch a televised fight at a friend's house. According to Howard, Amarie returned to the apartment about 7:00 or 8:00 p.m. Amarie had a knot on his forehead and a bruise on his right leg. When Howard asked him what happened, Amarie told her that he "got jumped

2

by a lot of kids." Amarie was "coherent and acting well." He ate dinner around 10:00 p.m. and went to bed.

Appellant returned to the apartment about 1:00 a.m. on May 3, 2015. About 3:37 a.m., there was a phone call between appellant and Howard. According to cell phone data, at this time appellant was at or in the vicinity of the apartment. In this call, Howard told appellant, "Hey, don't hurt him," and appellant responded, "All right. He's all right." Appellant was awakened by Amarie's coughing between 9:30 and 10:00 a.m. Amarie had wet the bed and was unresponsive. Appellant placed Amarie in the shower to try to wake him up.

At approximately 11:14 a.m., Howard called 9-1-1. Howard told the operator that Amarie was not responsive after she and appellant tried to wake him. Paramedics arrived. Appellant and Howard informed them that Amarie had come home with injuries the previous day after being in a fight. Paramedics noted what appeared to be "adult hand print bruising" on Amarie's back. Paramedics took Amarie to a nearby hospital. From there, Amarie was life-flighted to Children's Memorial Hermann Hospital.

In addition to telling medical personnel about how Amarie was "jumped" by some kids, appellant and Howard told police that Amarie may have fallen down the stairs. Howard called appellant from the hospital at about 1:18 p.m. Howard told appellant she would go "f**king crazy" if Amarie died and that "[t]hey gonna have to find out who did this—to Amarie." Appellant told Howard to "just chill" and not "talk" to the authorities. He also acknowledged they should have brought Amarie to the hospital sooner. At 11:27 p.m., Amarie was pronounced dead.

During a search of the apartment, Deputy S. Simpson, a crime scene investigator with the Harris County Sheriff's Office (HCSO), collected a ripped men's XL t-shirt that was found to contain appellant's DNA and Amarie's blood.

3

Amarie's DNA was located on a scuffed-up wall of the apartment. HCSO also collected appellant's belt, which contained appellant's DNA.

Police twice interviewed appellant. Appellant denied that he ever whipped, struck, or spanked Amarie. Appellant instead claimed that he made Amarie "work out for his whoopings," such as by doing push-ups. During their second interview with appellant, police told him Howard provided a detailed story of what happened that implicated appellant.

After appellant was arrested for capital murder, he called his father from jail. Appellant stated: "It ain't no bulls**t case," and "This ain't no bulls**t time." He informed his father that "[t]he boy done caught a butt whoopin'." Appellant told his father that Howard "went up there and told [police] something else" and that he could not "knock her." Appellant also called his mother from jail. Appellant told his mother that he should have listened to her and should not have "went over there." Appellant admitted to his mother that "[t]he boy got a whoopin' the night before," appellant was the one who "gave [Amarie] a whooping," and appellant "should have never whooped [Amarie]."

Appellant was indicted and tried for capital murder. At trial, medical evidence showed Amarie suffered severe external and internal injuries that were inconsistent with having been sustained in a playground fight with other children or in an accidental fall. Amarie had three pelvic fractures and two fractures at the base of his skull, which caused bleeding in his brain and swelling all along his spinal cord. Amarie had multiple cuts and several-inch-long contusions on his head; linear and striated bruises on his legs and buttocks; and bruises on his ribs, hip, torso, and shin. The beating involved multiple hard blows that occurred with high speed and extreme force. The beating involved Amarie being struck by hand or with or against a blunt object. The force was strong enough to crush his skin in various places. Amarie

4

would not have been able to walk home and would have lost consciousness. It would have been obvious that Amarie required immediate medical assistance. According to Sergeant D. Wolfford, a detective and the supervisor of HCSO's child abuse unit, appellant's belt was consistent with the striated injuries on Amarie's legs and buttocks. Child abuse pediatrician Dr. R. Giradet opined that Amarie "was severely beaten, and the beat[ing] was responsible for his death." Harris County assistant medical examiner Dr. D. Phatak testified that Amarie's cause of death was multiple blunt force injuries.

Appellant objected to the inclusion of the law-of-parties instruction in the jury charge. The trial court overruled this objection. The jury returned a verdict of guilty on the charge of capital murder. Because the State did not seek the death penalty, the trial court sentenced appellant to life imprisonment without the possibility of parole. *See* Tex. Penal Code § 12.31(a)(2) (West 2017). Appellant timely appealed.

## II.  ANALYSIS

## A. Legal sufficiency of the evidence

When reviewing the sufficiency of the evidence to support the jury's guilty verdict in a criminal case, we consider whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). Under this standard, "*all of the evidence* is to be considered in the light most favorable to the prosecution." *Jackson*, 443 U.S. at 319 (emphasis in orig.). Courts of appeals consider the combined and cumulative force of all evidence in the record, whether admissible or inadmissible, to make this determination. *Johnson v. State*, 509 S.W.3d 320, 322 (Tex. Crim. App. 2017); *Russeau v. State*, 171 S.W.3d 871, 879 n.2 (Tex. Crim. App. 2005); *see Jackson*, 443 U.S. at 319 (1979). "Although we consider everything presented at trial, we do not reevaluate

the weight and credibility of the evidence or substitute our judgment for that of the fact finder." *Price v. State*, 456 S.W.3d 342, 347 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd). We "only ensure the jury reached a rational decision." *Kolb v. State*, 523 S.W.3d 211, 214 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd).

"It is not necessary that the evidence directly prove defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing the guilt of the actor, and circumstantial evidence alone may be enough to establish guilt." *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013); *see Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015). The jury is permitted "to draw multiple reasonable inferences as long as each inference is supported by the evidence presented at trial." *Hooper v. State*, 214 S.W.3d 9, 15 (Tex. Crim. App. 2007). "The jury is the sole judge of credibility and weight to be attached to the testimony of witnesses." *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013) (citing *Jackson*, 443 U.S. at 319). We defer to the jury's responsibility to fairly resolve or reconcile conflicts in the evidence, and we draw all reasonable inferences from the evidence in favor of the verdict. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

A person commits murder when he "intentionally or knowingly causes the death of an individual." Tex. Penal Code § 19.02(b)(1). A person commits capital murder if he murders an individual under ten years of age. *Id.* § 19.03(a)(8). Identity of the guilty party may be proven by direct evidence, circumstantial evidence, and reasonable inferences made from available evidence. *Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009). Intent may be determined from a defendant's words, acts, and conduct, and "is a matter of fact, to be determined from all of the circumstances." *Smith v. State*, 965 S.W.2d 509, 518 (Tex. Crim. App. 1998).

Appellant contends that the evidence is not strong enough to support logical

6

inferences of his guilt. We disagree. Based on our review of the record, properly keeping these deferential standards in mind, we conclude that the evidence is legally sufficient to support the jury's verdict. *See Jackson*, 443 U.S. at 319, 326; *Temple*, 390 S.W.3d at 360, 363.

Appellant discounts the medical evidence for not informing the jury "definitively, how Amarie received such horrible injuries." But such "pinpoint" precision is not required so long as the evidence reasonably narrows the means and manner and potential time frame of injury. *See Martin v. State*, 246 S.W.3d 246, 261–63 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (evidence was legally sufficient to support capital murder of child despite lack of exact time and manner of blunt force trauma).

Giradet and Phatak opined that Amarie's injuries resulted from multiple, hard, high-speed and high-energy blunt force traumas dealt by a hand or an object or both. "[T]here was an impact to the back of the head sufficient enough to fracture the back of the skull and to have that fracture be accompanied by a separate fracture within the skull." The pelvic fractures sustained by Amarie are not common outside of a major car accident or a fall from a great height. Amarie was "severely beaten." Amarie's injuries were acute and incapacitated him.

Amarie was responsive and mobile when he went to bed after 10:00 p.m. on May 2. Appellant returned to the apartment about 1:00 a.m. The 3:37 a.m. phone call indicates that appellant had the opportunity to be alone with Amarie. *See Temple*, 390 S.W.3d at 360 (opportunity is circumstance indicative of guilt). By 9:30 or 10:00 a.m., Amarie had wet himself, had difficulty breathing, and was unresponsive. Appellant admitted to giving Amarie a "whoopin' the night before." The jury reasonably could have inferred from the evidence that appellant gave Amarie much more than a "simple spanking" sometime in the early morning hours

7

of May 3. *See Lindsey v. State*, 501 S.W.2d 647, 648–49 (Tex. Crim. App. 1973).

Appellant argues that medical evidence of the presence of chronic cells showed Amarie could have received some of his injuries up to 48 hours prior to the autopsy.[1] However, Amarie's autopsy report stated that the cranial and pelvic injuries occurred "at or around the time of death." Both Giradet and Phatak testified that the skull and pelvic fractures were recent, acute injuries. Forensic anthropologic analysis also revealed there was no evidence of healing to Amarie's skull and pelvic fractures. The jury reasonably could have inferred that the blunt force traumas causing these severe injuries occurred in the early morning the day Amarie died.

The jury also reasonably could have concluded that appellant intended to injure Amarie when he was "whooping" him. Appellant was fit and muscular, weighed between 185 to 195 pounds, and wore a men's size XL, while Amarie wore a toddler boys' size 4T. *See Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995) (intent may be inferred from extent of injuries and relative size and strength of parties); *Lindsey*, 501 S.W.2d at 648; *Herrera v. State*, 367 S.W.3d 762, 771 (Tex. App.—Houston [14th Dist.] 2012, no pet.) ("The severity and number of J.H.'s injuries also support a finding that appellant caused them intentionally or knowingly. Intent can be inferred from the extent of the injuries to the victim, the method used to produce the injuries, and the relative size and strength of the parties.").

Amarie's blood was found on appellant's t-shirt that was "ripped along the upper right shoulder area." Although appellant does not dispute that this evidence is incriminating, he protests the State did not "exclude all other reasonable explanations" for the presence of blood other than appellant killed Amarie. The State, however, was not required to do so. *See Ramsey*, 473 S.W.3d at 808; *Wise v.*

---

[1] The autopsy commenced at 2:15 p.m. on May 4, 2015, and was concluded on May 5, 2015.

8

*State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012) ("For the evidence to be sufficient, the State need not disprove all reasonable alternative hypotheses that are inconsistent with the defendant's guilt."). Appellant indicated that he was wearing this t-shirt while he was attending to Amarie; however, appellant changed out of it before paramedics and police arrived. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) (attempts to conceal incriminating evidence are probative of wrongful conduct and are circumstances of guilt).

Amarie's DNA was identified in a scuff mark along the wall of the master bedroom. The mark contained "small fibers." Appellant faults the lack of testimony as to how or when Amarie left his DNA on the wall. However, the jury reasonably could have inferred from the evidence of the multiple, extremely forceful blows inflicted upon various parts of Amarie's body, including his head, that at some point during the course of the beating appellant threw Amarie into, or Amarie's body made contact with, the wall.

Appellant also complains of the lack of a forensic comparison between his belt and Amarie's bruising. However, both Giradet and Phatak testified that a belt could have been used to inflict the "pattern" injury on Amarie's legs and buttocks. Moreover, the jury was free to credit Wolfford's testimony as an experienced child abuse investigator that appellant's belt was consistent with the linear abrasions found on Amarie. *See Temple*, 390 S.W.3d at 360.

Appellant and Howard told medical personnel and police that Amarie sustained his injuries in a fight with other children or fell down the stairs. These stories, however, were implausible, given the extreme severity of the child's injuries. *See Guevara*, 152 S.W.3d at 50 (lies and implausible explanations are probative of wrongful conduct and are circumstances of guilt). Wolfford explained the stair story was a classic sign of child abuse: "Often adults will try to explain injuries to a child

9

that are often caused by the hands of an adult." Wolfford also testified that key parts of appellant's and Howard's statements were identical and appeared to be "rehearsed."

Additionally, it would have been obvious that Amarie needed immediate medical attention due to his serious injuries. However, appellant and Howard delayed calling 9-1-1 for almost two hours. *See Martin*, 246 S.W.3d at 262 (delay in seeking medical care supported consciousness of guilt). Wolfford testified that appellant's attempt to revive Amarie in the shower in the morning was particularly significant "[b]ecause it is a delay of calling law enforcement or medical, emergency medical services. It is a last ditch effort to avoid that." Appellant acknowledged in the phone call with Howard at 1:18 p.m. on May 3 that Amarie should have been taken to the hospital sooner. The jury reasonably could have concluded that appellant was attempting to hide his abuse of Amarie.

Also, appellant engaged in "unusual" and "odd behavior" after Amarie was taken to the hospital. While the police at the scene were waiting for homicide investigators to arrive, appellant's "only concern" was not going to the hospital or what happened to Amarie. Instead, appellant insisted that he "go wash up" and straightened up the living room. Appellant kept touching items in the apartment after police repeatedly asked him to stop. The jury reasonably could have relied on appellant's strange behavior after the crime to infer his guilt. *See id.*; *Hinojosa v. State*, 4 S.W.3d 240, 253 (Tex. Crim. App. 1999).

In the 1:18 p.m. phone call on May 3, appellant cautioned Howard: "Listen, just let them do their job. All we can do is really just let them do their job right now. Please. Don't talk, you know, you—just chill. 'Cause we can't do anything about it right now. Just let them do their job." Appellant's attempt to silence Howard reasonably supported his consciousness of guilt. *See Temple*, 390 S.W.3d at 362

10

(considering evidence that appellant asked witness to "keep his mouth shut"); *Wilson v. State*, 7 S.W.3d 136, 141 (Tex. Crim. App. 1999) ("Such an attempt to tamper with a witness is evidence of 'consciousness of guilt.'").

Cell phone data confirmed that appellant returned to the apartment about 1:00 a.m. and remained in the vicinity the rest of the night. Appellant told police that he had been drinking, passed out, was asleep all night, and did not see Amarie until the morning. However, the 3:37 a.m. phone call between appellant and Howard tended to show that appellant was awake and could have been alone with Amarie at that time. Again, appellant lied to police. *See Guevara*, 152 S.W.3d at 50. And, the jury reasonably could have concluded that there was opportunity for appellant to commit the crime. *See Temple*, 390 S.W.3d at 360.

Appellant denied to police that he ever whipped, spanked, or struck Amarie. However, appellant was involved in the physical discipline of Amarie, subjecting him to push-ups and boxing classes to "toughen" him up. Moreover, appellant lied to police about never whipping Amarie. *See Guevara*, 152 S.W.3d at 50. Appellant confessed in phone calls from jail to both his father and mother that appellant had inflicted a "butt-whoopin'" on Amarie the night before he died. *See Lindsey*, 501 S.W.2d at 648–49 (finding evidence sufficient to show appellant inflicted injuries resulting in death considering "admission that he whipped child" and medical testimony that injuries could not have been accidental). Appellant also admitted to his mother that he "should never have whooped [Amarie]." Appellant knew that he had "f**ked up" and was facing significant incarceration time because it was not a "bulls**t case."

Appellant acknowledges the "incriminating" nature of the jail calls appellant made to his father and mother but asserts that "it is just as reasonable for his comments to mean" that he only had spanked Amarie, appellant realized the

11

seriousness of the charges against him, and Howard had made statements against appellant "to make a deal for herself." The jury, however, could have resolved any conflicting inferences in favor of appellant's guilt; and we must presume that it did. *See Jackson*, 443 U.S. at 319; *Temple*, 390 S.W.3d at 360.

Further, appellant expressed concern via his text message to Howard before they got back together that it was "dangerous" for him to be around Amarie. There was evidence that appellant was angered when Howard spoke to her ex-husband Hunter on the afternoon of May 2. There also was evidence that in the 3:37 a.m. phone call Howard asked appellant not to hurt Amarie. The jury reasonably could have concluded that appellant had issues controlling his anger and had unleashed his anger on Amarie. *See Temple*, 390 S.W.3d at 360 (motive is circumstance indicative of guilt); *Guevara*, 152 S.W.3d at 50 ("Motive is a significant circumstance indicating guilt.").

Appellant asserts that the April 22, 2015, text message was mistakenly identified by Wolfford as being sent the same week of the murder instead of over a week prior. However, the State identified April 22, 2015, as the text's "sent date" when Wolfford read the text during his testimony. And, appellant does not explain how a few days' mistake would preclude the jury from rationally inferring appellant still had concerns that it was "dangerous" for him to be with Howard because of Amarie. Appellant complains the text lacked context but does not indicate what additional context was available or how it would have explained his statement.

Appellant argues Wolfford's interpretation of the 3:37 a.m. phone call—that Howard was worried for Amarie and begged appellant not to hurt him—"was a guess" not based on "personal knowledge." Appellant does not provide, and we have not located, any authority that requires any personal knowledge for Wolfford to interpret a phone call as an investigator. Placed in context, according to appellant,

he had been involved in the physical discipline of Amarie, and Howard "wanted [appellant] to whoop" Amarie. Moreover, appellant already had informed Howard that staying with her was "dangerous" because of Amarie. Appellant also points out that Howard is not frantic or crying in the call. That Howard was not overly emotional does not preclude the jury from reasonably inferring she had concerns about appellant's treatment of Amarie.

Appellant also argues a rational person could not conclude that the "him" in Howard's "Don't hurt him" statement was Amarie. Appellant contends that the "him" could not be Amarie if appellant was not at the apartment. However, evidence places Amarie in the apartment and appellant in the vicinity of the apartment at 3:37 a.m. Appellant argues that the "him" Howard referenced also could be her ex-husband. Again, the State did not have to exclude all other possibilities. *See Ramsey*, 473 S.W.3d at 808; *Wise*, 364 S.W.3d at 903.

We conclude that the evidence, viewed in the light most favorable to the verdict, is legally sufficient to permit a rational jury to convict appellant of the capital murder of Amarie. *See, e.g.*, *Martin*, 246 S.W.3d at 263. We overrule appellant's first issue.

## B. Howard's statements to police concerning appellant

In his second and third issues, appellant challenges the trial court's decision to allow the State to introduce certain statements regarding what Howard said to police about appellant's involvement in the offense because, appellant claims, the references constituted inadmissible hearsay, were unduly prejudicial, and violated his rights under the Confrontation Clause. Appellant challenges these four statements:

- That's not what the evidence and that's not what Brandi said. She gives a detailed story of what happened.

13

- Brandi told us a story today okay. I sat here and I almost broke down in tears because of the story that I heard for her, for you, for Amarie, mainly. That's why I broke down.

- We know what happened, happened. In other words, what I'm saying is Brandi told us what happened. I believe Brandi.

- I'm going to tell you this, Brandi did tell on you, plain and simple. Can't get no plainer than that.

Appellant filed a pretrial motion to exclude these statements from the videotaped recording of his second interview because they were hearsay, their prejudicial effect far outweighed the probative value, and their admission would violate his rights under the confrontation clause of the Sixth Amendment of the United States Constitution. The trial court held a hearing during trial outside the presence of the jury and overruled these objections.

The State responds that appellant waived error because, during Wolfford's testimony when the State moved to introduce the recording, appellant stated, "I have no objections." "[W]hen assessing the meaning of an attorney's statement that he or she has 'no objection' in regard to a matter that may have been previously considered and ruled upon, courts should first ask whether 'the record as a whole plainly demonstrates that the defendant did not intend, nor did the trial court construe, his "no objection" statement to constitute an abandonment of a claim of error that he had earlier preserved for appeal.'" *Stairhime v. State*, 463 S.W.3d 902, 906 (Tex. Crim. App. 2015) (quoting *Thomas v. State*, 408 S.W.3d 877, 885 (Tex. Crim. App. 2013)). If, after applying the test, it remains ambiguous whether abandonment was intended, then we must resolve the ambiguity in favor of finding waiver. *Id.*

The record is ambiguous and therefore favors waiver. *See id.* Although the trial court told defense counsel that it would be willing to give a limiting instruction

14

concerning these statements, subject to the court's approval, appellant did not request any instruction when the statements were admitted. As a result, the statements were admitted for all purposes. *See Williams v. State*, 273 S.W.3d 200, 230 (Tex. Crim. App. 2008); *Hammock v. State*, 46 S.W.3d 889, 895 (Tex. Crim. App. 2001). Also, arguably, appellant strategically abandoned his objections to the statements in favor of attacking Howard's credibility. During closing arguments, defense counsel repeatedly referred to Howard's "lies" and to Howard as a "liar." Rather than shying away from Howard's statements to police concerning appellant's involvement in the offense based on the prior objections, appellant affirmatively referenced those statements. For example, defense counsel stated:

- As they closed in on Brandi, that is when she pointed the finger at Sherrick because she did not want to face a capital murder trial. It was self-serving on her part.

- She lied not once, not twice, not three times; but when questioned the fourth time by law enforcement when the walls were closing in and her child was dead, she made up a story. She made up a story.

- [S]he who sings the first and the loudest wins the prize . . . .

*See Sharper v. State*, 485 S.W.3d 612, 615–16 (Tex. App.—Texarkana 2016, no pet.) (finding waiver of confrontation-clause error where appellant stated, "No, Your Honor," when asked if there were objections to redacted interview transcript, and where in closing argument appellant strategically attacked alleged accomplice's motivation for giving implicating statements contained in transcript).

Even if appellant had preserved error, we would conclude that appellant was not harmed by any confrontation-clause error.[2]  *See Jackson v. State*, 468 S.W.3d

---

[2] We need not address whether the statements violated the hearsay rule or were unfairly prejudicial because we presume the statements violated appellant's right to confront adverse witnesses. *See Diamond v. State*, 496 S.W.3d 124, 140 n.2 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd). "The standard for reviewing harm from a presumed error in admitting a statement

189, 195 & n.3 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (reaching suppression issue despite appellant's "no objection" statement when State offered videotape and inventory form).

We presume for the sake of argument that these statements regarding what Howard said to police were inadmissible because they violated appellant's right to confront her. A confrontation-clause violation is constitutional error that requires reversal unless we conclude beyond a reasonable doubt that the error was harmless. *See* Tex. R. App. P. 44.2(a); *Davis v. State*, 203 S.W.3d 845, 849 (Tex. Crim. App. 2006). In determining whether the error was harmful, a reviewing court may consider various factors, including: (1) the importance of the hearsay evidence to the State's case, (2) whether the hearsay evidence was cumulative of other evidence, (3) the presence or absence of evidence corroborating or contradicting the hearsay testimony on material points, and (4) the overall strength of the State's case. *Davis*, 203 S.W.3d at 852. We must ask whether there is a likelihood that the constitutional error was a contributing factor in the jury's deliberations in arriving at its verdict. *Smith v. State*, 436 S.W.3d 353, 372 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd) (citing *Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007)). "Put another way, is there a reasonable possibility that the *Crawford* [*v. Washington*, 541 U.S. 36 (2004),] error, within the context of the entire trial, moved the jury from a state of non-persuasion to one of persuasion on a particular issue?" *Davis*, 203 S.W.3d at 852–53.

---

containing hearsay is lower than the standard for reviewing harm from a presumed error in admitting a statement that violated appellant's right to confront adverse witnesses." *Id.* (citing cases and explaining that error in admitting hearsay is not reversible unless it affected defendant's substantial rights while constitutional error requires reversal unless appellate court concludes beyond a reasonable doubt that error is harmless). Likewise, error under rule 403 is non-constitutional and subject to a lower standard of review for harm. *See Banks v. State*, 494 S.W.3d 883, 895 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd).

The hearsay statements attributed to Howard were not overly important to the State's case. The trial evidence, as well as the State's closing argument, focused largely on appellant—his anger and jealousy over Howard; his intent to kill based on Amarie's injuries and appellant's size; appellant's "guilty" behavior in changing his blood-stained shirt; his lie about drinking and then sleeping all night; his belt being consistent with Amarie's bruising; appellant's repeated lies about never touching Amarie; and appellant's admissions that he "f**ked up," it was not a "bulls**t case," and he gave Amarie a "butt whoopin'." During closing argument, the State highlighted the importance of appellant's own "damning" statements and "plain speak": "Guilty people say the things that he says to his mother and his father. Guilty people lie about basic things about what they were doing that night in the phone conversations that they claim they didn't have." *See Diamond v. State*, 496 S.W.3d 124, 141 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd) (considering State's focus on appellant's statement). To the extent the State brought up Howard's statements to police in closing argument, it was in the context of emphasizing appellant's own statement to his father. The State argued:

> [A]nd I can't knock Brandi; and my God, do they hide from that. That is what kills them right there is that Sherrick Washington knows that whatever Brandi said is the truth, and he can't knock it.

> We all know that she told the lie, the lie that he started. We know that she was a loyal soldier for some point in time until he was separated from her; but at the end of the day, him, himself, can't knock Brandi Howard for what happened. He knows he did what he did, and he can't knock her for it, and that is what he said to his father, and that is why they don't want to talk about [the State's CD exhibit containing the jail call between appellant and his father].

In addition, the statements reportedly made by Howard to police implicating appellant duplicated other evidence admitted without objection at trial. *See id.* Within the same interview (but not objected to by appellant), Wolfford also told

17

appellant, "And the only other witness there says that you—you did that." Appellant responded, "Now, saying that Brandi does—it's impossible for Brandi to tell you that. Now if she told you that, then I don't know why, but that's impossible for her to tell you that. And that's not the way it happened." Later on during the interview (again, not objected to by appellant), another officer told appellant, "I know that you—you probably just don't believe what they told you, you don't believe that Brandi said what she said . . . . At some point you'll be able—you'll find out exactly what she said." References to Howard's statements implicating appellant also came in during cross-examination when defense counsel himself asked Wolfford if Howard "point[ed] the finger" at his client, and Wolfford responded that she had. Defense counsel also asked Wolfford, "By telling you that my client is responsible for causing the death of her child, [Howard] does not get charged with capital murder after that interview, correct?" Wolfford responded, "She didn't get charged after that interview, no." Further, that Howard implicated appellant in her interview with police came in through appellant's jail call with his father.

Additionally, although not evidence, during his opening statement, defense counsel stated that Howard "concocted the story [sic] point the finger at Sherrick Washington; and that was to cover her own tracks. We are going to put on evidence to show you . . . that she has concocted this story and that it is a lie." Nor, as discussed above, did appellant sidestep Howard's statements to police during closing argument.

Finally, as detailed above in our discussion of legal sufficiency, the State presented substantial evidence of appellant's guilt, which in general tended to corroborate the statements about Howard's "telling" on appellant to police. *See id.* Given the record before us, we conclude that any error in admitting the four challenged statements is harmless beyond a reasonable doubt. *See Davis*, 203

S.W.3d at 856; *Diamond*, 496 S.W.3d at 141.

We overrule appellant's second and third issues.

## C. Howard's "Don't hurt him" statement

In his fourth issue, appellant challenges the trial court's decision to allow the portion of the 3:37 a.m. phone call between appellant and Howard in which Howard told appellant, "Don't hurt him," because it constituted inadmissible hearsay and was unduly prejudicial. Appellant contends that the State did not offer Howard's statement to provide context for appellant's party admission, "All right. He's all right," but rather for the sole purpose of arguing to the jury that appellant intended to, and did, hurt Amarie.

The State first responds that appellant waived any error. As part of his motion to exclude, appellant objected to Howard's "Don't hurt him" statement within the 3:37 a.m. phone call based on hearsay and undue prejudice. During trial, the trial court held a hearing outside the presence of the jury and overruled appellant's objections.[3] Later, when the State moved to admit the flash drive containing the recording of this phone call, defense counsel stated, "I have no objections, judge."

We agree with the State. The record and context here demonstrate that appellant intended to abandon his objections to Howard's statement, "Don't hurt him." *See Stairhime*, 463 S.W.3d at 906. During cross-examination, defense counsel asked Wolfford about the 3:37 a.m. phone call and expressly referenced Howard's "Don't hurt him" statement. In closing argument, defense counsel expressly referenced this particular statement by Howard and argued she "cunningly" recorded her phone call with appellant. Defense counsel specifically

---

[3] At the time of the hearing, appellant also objected to Howard's "Don't hurt him" statement in the phone call based on the Confrontation Clause. The trial court also overruled this objection; however, appellant does not raise and therefore has abandoned this objection on appeal.

19

asked the jury to "listen" to the phone call on the flash drive:

> . . . [B]ut the state will draw your attention to this 3:36 phone call captured on a recording by a woman who is cunning and plans and is meticulous; and at 3:36 in a 11-second phone call Brandi Howard says, "Don't hurt him." Mr. Washington says, "He is all right."
>
> Go back and listen to that. It is on the state's flash drive, and remember this and remember that with no scientific accuracy because the cell phone tower lady said that they were not in the same house.
>
> I will tell you what is a reasonable deduction from that phone call if you listen to it. Mr. Washington had been out partying with his friend and his dad having a few cocktails. It sounds to me like he is asleep, asleep in one of the other bedrooms in the same apartment as Brandi Howard who spent the last three hours beating her child to death and put that baby to bed and walked away. That is what the evidence suggests.[4]

We conclude on this record that appellant's utterance of "no objections" to the State's admission of the flash drive results in waiver of his challenges to Howard's "Don't hurt him" statement. *See id.* at 907; *McCoslin v. State*, 558 S.W.3d 816, 822 (Tex. App.—Houston [14th Dist.] 2018, pet. filed) ("[I]f the State offers the subject evidence and the defendant affirmatively voices 'no objection,' then the defendant will have waived any error in admission of the evidence."); *Sharper*, 485 S.W.3d at 616; *Harper v. State*, 443 S.W.3d 496, 498–99 (Tex. App.—Texarkana 2014, pet. ref'd) (finding waiver where appellant affirmatively stated he had "no objection" to admission of State's cocaine evidence and where appellant's "trial tactic of emphasizing the relatively small amount of cocaine in the pill bottle"

---

[4] The State discussed Howard's "Don't hurt him" statement in its rebuttal:

> . . . [Appellant] was put on notice to not hurt the child at 3:37. This isn't him sleeping in another room. This isn't her just saying stuff to say stuff. If it really were the case, hey, don't hurt him. The natural response is if you are not a guilty person is, "What the hell are you talking about, lady? What do you mean don't hurt him? Isn't he asleep? Isn't he in bed? What is going on here[?]

supported "full relinquishment" of previous evidentiary challenge).

We overrule appellant's fourth issue.

## D. Evidence concerning Howard's mental health

In his fifth issue, appellant argues the trial court denied him his constitutional right to present a complete defense when it excluded evidence that Howard was an alternate perpetrator of the offense. Specifically, appellant contends that the trial court should have ordered the State to produce medical records concerning Howard's mental illness—namely post-traumatic stress disorder (PTSD) and anger issues—so that appellant could introduce the records into evidence during trial. Appellant relies on *Holmes v. South Carolina*, 547 U.S. 319 (2006).

However, the record does not indicate that appellant preserved any constitutional issue concerning Howard's medical records by presenting such argument to and obtaining a ruling from the trial court. *See* Tex. R. App. P. 33.1(a); *Leza v. State*, 351 S.W.3d 344, 360–61, 361 n.67 (Tex. Crim. App. 2011); *Rodriguez v. State*, 368 S.W.3d 821, 826 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Nor in his reply brief does appellant argue that such error is immune to ordinary principles of procedural default. *See Leza*, 351 S.W.3d at 361 & n.68; *Rodriguez*, 368 S.W.3d at 826. Therefore, we overrule this portion of appellant's fifth issue without reaching the merits. *See Leza*, 351 S.W.3d at 360–61 (finding *Holmes* constitutional error not preserved under similar circumstances); *Rodriguez*, 368 S.W.3d at 826 (same).

In addition, appellant states that such evidence is "subject to disclosure under Article 39.14(a) of the Texas Code of Criminal Procedure" and "[a]ccordingly, the trial court should have ordered the State to produce it when requested by the defense

at trial."[5]  However, appellant provides no record citations and no additional argument or analysis on this point.  We conclude that appellant waived his article-39.14 complaint for inadequate briefing.  *See* Tex. R. App. P. 38.1(i); *Ferrer v. State*, 548 S.W.3d 115, 121 (Tex. App.—Houston [14th Dist.] 2018, pet. ref'd) (finding briefing waiver where "[a]ppellant does not elaborate on how article 39.14 was violated or why such violation requires reversal").

Even if appellant adequately had briefed this sub-issue, the record reflects that the State provided access to, and defense counsel previously had "read," whatever of Howard's medical records the State had.  *See Ferrer*, 548 S.W.3d at 121 (State provided appellant with access to recording at issue).  Presuming for the sake of argument that Howard's mental-health medical records properly were subject to disclosure under article 39.14(a),[6] the first time appellant raised any objection on the record that the State had not produced them was several days into trial.  The trial court specifically stated that it had not been informed of and had not been asked to rule on any article-39.14 discovery issue before trial.  The State indicated it had a copy of the document at issue that could be redacted, and the trial court indicated it was willing to order the State to give appellant the document if the court deemed it relevant.  However, the record does not reflect that appellant ever asked the trial court to issue a discovery ruling, much less that the trial court did so.  *See id.* (record did not reflect that trial court issued order or ruling on appellant's discovery motion).  Nor did appellant attempt to introduce any of Howard's mental-health records.  In

---

[5] Article 39.14, entitled "Discovery," requires that the State, upon request of the defendant, produce evidence that "constitute[s] or contain[s] evidence material to any matter involved in the action and that [is] in the possession, custody, or control of the state or any person under contract with the state."  Tex. Code of Crim. Proc. art. 39.14(a) (West 2017).

[6] At trial, the State argued that it had "duties under HIPAA" regarding protecting these documents and that it had not received the Department of Public Safety (DPS) document at issue until it was provided to the State during Howard's trial.

22

fact, just before the close of appellant's case, defense counsel expressly stated: "The only outstanding legal issue there was was relative to the DPS record; and we are not moving to introduce it, so we don't need a ruling on that because we are not going to get into the who has anger issues argument." Under these circumstances, we cannot conclude that the trial court abused its discretion regarding any discovery determination. *See McBride v. State*, 838 S.W.2d 248, 250 (Tex. Crim. App. 1992) (generally determination of discoverability under article 39.14 is committed to discretion of trial court.); *see also Ferrer*, 548 S.W.3d at 121 (finding no article-39.14 violation).

We overrule appellant's fifth issue.

## E. Excluded testimony by appellant's mother

In his sixth issue, appellant argues that the trial court erred in not permitting appellant's mother Lonye Ojeaga to testify (1) that "'whooping' means spanking in their family" and (2) "about conversations she had with [appellant] when she advised him to break up with Ms. Howard."

The following exchange occurred during appellant's direct examination of Ojeaga:

> Q. So in your household when you say, "You are going to get a whipping or I whipped that child," what does that mean to you?
>
> [Prosecutor]: Objection to the relevance.
>
> THE COURT: What it means to her, that is sustained.
>
> Q. (By [Defense Counsel]) What do you believe that Sherrick meant on the phone during your conversation when he said, "I whipped him when Brandi asked me to"?
>
> [Prosecutor]: Objection to the speculation.
>
> THE COURT: Sustained.
>
> Q. (By [Defense Counsel]) Do you use the term, ["]whipping"?

23

A. I use the term whipping; but I spank, you know, with a switch.

[Prosecutor]: Objection to the nonresponsive answer to the question.

THE COURT: Overruled.

She answered.

Although the trial court sustained the State's objections based on relevancy and speculation, defense counsel was successfully able to elicit testimony from Ojeaga, the mother of multiple children, that she uses the term "whipping" to mean "spank[ing] . . . with a switch." During closing argument, defense counsel argued appellant's jail calls only showed, whether "wrong or right," that he "spanked" Amarie: "We know from mama's own testimony that whipping in the black community means a spanking, nothing more, nothing less. It certainly doesn't mean to pick up a child and throw him against a wall. That isn't a whipping. That is a beating. A whipping is a spanking."

An appellant may not complain on appeal about the erroneous exclusion of evidence unless the appellant made an offer of proof in the trial court or the substance of the evidence was apparent from the context. Tex. R. Evid. 103(a)(2). "It is the appellant's burden to make a record, through a bill of exceptions, of the evidence he or she desires admitted." *Montgomery v. State*, 383 S.W.3d 722, 726 (Tex. App.—Houston [14th Dist.] 2012, no pet.). The primary purpose of an offer of proof is to enable the appellate court to determine whether the exclusion was erroneous and harmful. *Mays v. State*, 285 S.W.3d 884, 890 (Tex. Crim. App. 2009). Appellant did not present any specific offer of proof to the trial court to—and does not on appeal—further explain what else Ojeaga substantively would have added to her "whipping is spanking" definition. Nor is the substance of such allegedly excluded testimony otherwise apparent from the record. We conclude that this error has not been adequately preserved. *See Holmes v. State*, 323 S.W.3d 163, 171 (Tex. Crim.

App. 2009); *see also* Tex. R. Evid. 103(a)(2).

Second, appellant argues that Ojeaga's testimony about her conversations with appellant where she provided him with relationship advice would have provided "the correct context" for and cleared up false impressions left by the State's evidence, namely, the text message between appellant and Howard and Howard's jail call with Ojeaga.

After the trial court sustained the State's hearsay and relevancy objections,[7] appellant expressly offered such testimony under rules 106 and 107 of the Texas Rules of Evidence.[8] The State continued to object on hearsay and relevancy grounds. The State further objected because "[a]ny probative value is clearly outweighed by any prejudicial effect." The trial court also sustained the State's rule-403 objection.

"The purpose of [rule 107] is to reduce the possibility of the jury receiving a false impression from hearing only a part of some act, conversation, or writing." *Credille v. State*, 925 S.W.2d 112, 116 (Tex. App.—Houston [14th Dist.] 1996, pet. ref'd). Rule 107 permits the introduction of otherwise inadmissible evidence when that evidence is necessary to fully and fairly explain a matter "opened up" by the opposing party. *See* Tex. R. Evid. 107; *Credille*, 925 S.W.2d at 116. "A party opens the door by leaving a false impression with the jury that invites the other side to

---

[7] In his brief, appellant argues that Ojeaga's testimony was not hearsay because it was not an out-of-court statement and it was offered to correct a false impression instead of the truth of the matter. Appellant does not address relevancy.

[8] *See* Tex. Rs. Evid. 106 ("If a party introduces all or part of a writing or recorded statement, an adverse party may introduce, at that time, any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time. 'Writing or recorded statement' includes depositions."), 107 ("If a party introduces part of an act, declaration, conversation, writing, or recorded statement, an adverse party may inquire into any other part on the same subject. An adverse party may also introduce any other act, declaration, conversation, writing, or recorded statement that is necessary to explain or allow the trier of fact to fully understand the part offered by the opponent. 'Writing or recorded statement' includes a deposition.").

respond." *Hayden v. State*, 296 S.W.3d 549, 554 (Tex. Crim. App. 2009). "But even if a party opens the door to rebuttal evidence, the trial judge still has the discretion to exclude the evidence under Rule 403." *Id.* We consider the trial court's refusal to admit evidence for an abuse of discretion. *See id.*; *Hernandez v. State*, 528 S.W.3d 229, 234 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *Credille*, 925 S.W.2d at 119.

Here, appellant did not seek to introduce any missing portion of the text or phone conversations introduced by the State.[9] Rather, appellant sought to introduce testimony from Ojeaga about separate phone calls she allegedly had with her son concerning a relationship with a woman Ojeaga never met. Appellant contends that Wolfford's testimony "opened the door" for Ojeaga's testimony. But appellant does not cite, and we have not located, anything in Wolfford's testimony that created any false impression concerning, or invited further discussion of, other conversations appellant may have had with his mother about Howard. *See Hernandez*, 528 S.W.3d at 234. In any event, appellant does not argue that the trial court abused its "very substantial discretion" by sustaining the State's rule-403 objection. *See Powell v. State*, 189 S.W.3d 285, 288 (Tex. Crim. App. 2006). Under these circumstances, we cannot conclude that the trial court abused its discretion.

We overrule appellant's sixth issue.[10]

---

[9] The State offered and the trial court admitted (without objection by appellant) the flash drive containing Howard's full cell-phone download, *see supra* Section III.C, and the complete audio recording of appellant's jail call with Ojeaga.

[10] Within his sixth issue, appellant also states without any further analysis that the trial court prevented him from presenting a complete defense. To the extent that appellant seeks to assert a constitutional error under *Holmes*, he did not preserve this issue in the trial court. *See Leza*, 351 S.W.3d at 360–61; *Rodriguez*, 368 S.W.3d at 826.

26

**F. Jury instruction on law of parties**

Appellant argues "[b]ecause there was insufficient evidence that [he] committed the crime as a principal actor, it was error to instruct the jury on the law of parties." We already have concluded that there is legally sufficient evidence to support appellant's conviction as a principal actor in the capital murder of Amarie. Accordingly, we conclude that any error in charging the jury on the law of parties would be harmless. *See Ladd v. State*, 3 S.W.3d 547, 564–65 (Tex. Crim. App. 1999).

We overrule appellant's seventh issue.

### III.  CONCLUSION

Having overruled all of appellant's issues, we affirm the trial court's judgment.


/s/     Marc W. Brown
        Justice


Panel consists of Chief Justice Frost and Justices Donovan and Brown.
Publish—Tex. R. App. P. 47.2(b).