

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-17-00238-CR

———————————————

ERON MICHAEL SPIVEY, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 297th District Court
Tarrant County, Texas
Trial Court No. 1443186D

Before Sudderth, C.J.; Gabriel and Wallach, JJ.[1]
Memorandum Opinion by Justice Gabriel

---

[1]The Honorable Mike Wallach, Judge of the 348th District Court of Tarrant County, sitting by assignment of the Chief Justice of the Texas Supreme Court. *See* Tex. Gov't Code Ann. § 74.003(h).

## MEMORANDUM OPINION

Appellant Eron Michael Spivey appeals from his conviction for the capital murder of his girlfriend's two-year-old son. He argues that the evidence was insufficient to support his conviction and that the trial court abused its discretion by allowing an eleven-member jury to determine his guilt. We disagree and affirm the trial court's judgment.

## I. BACKGROUND

Spivey lived with his girlfriend, Jane, and Jane's two-year-old son, John.[2] On December 6, 2015, Patricia Sarsfield, who managed a Dollar General store, saw Spivey and John in the store. Spivey and John were "definitely regulars." Sarsfield noted that John was walking and talking as usual.

The next morning, December 7, Jane had to leave the house early. Before she left, she saw that John had thrown up, which was not unusual because John had been born prematurely. In fact, John was alert and talking. Spivey told Jane that he would clean it up. Before Jane left at 8:00 a.m., Jane kissed John, and John told her goodbye as he was standing in the hallway.

Spivey gave John a bath, and he stated that John was alert and able to get in and out of the bathtub. Spivey then drove John to work with him. Spivey worked at a furniture store and frequently took John with him. On the way to Spivey's job, he

---

[2]We use aliases to refer to the victim and his mother. *See* Tex. R. App. P. 9.8 cmt., 9.10; Tex. App. (Fort Worth) Loc. R. 7.

stopped at the Dollar General store at approximately 8:50 a.m. to buy a nasal aspirator for John. Spivey carried John into the store, and Sarsfield noticed that John was not responsive, seemed to be asleep, and was making "gurgling sounds." The store's surveillance video showed John was unable to hold his head up and appeared "lifeless, like limp."

When Spivey and John arrived at the furniture store at approximately 9:30 a.m., Spivey placed John on his stomach on a mattress at the back of the store. Latisha Love, Spivey's supervisor who had seen John many times at the store while Spivey was working, noticed that John was different. Usually, John would snack and watch videos on Love's laptop; but on December 7, John lay on his stomach on the mattress and loudly snored for the rest of the morning. During the afternoon, Spivey moved John to a pallet on the breakroom floor, and Love and another employee saw Spivey try to wake John up by shaking him and using a stethoscope to check John's heartbeat. When Love and the employee asked Spivey what was wrong with John, Spivey told them John was sick. Spivey left with John at 5:55 p.m. After they left, Love saw blood on the mattress at the back of the store and blood in the breakroom. Love closed the store and called the police.

Meanwhile, Spivey drove home, picked up Jane, and told her that John had to see a doctor because something was wrong with him. When she got in the car, Jane saw that John was slumped back in his car seat with his head on his shoulder. Spivey told Jane that John had been sleeping all day. By the time John arrived at a hospital,

3

he was cold and his pupils were fixed and dilated. John had bruising on his torso and abdomen and swelling on his forehead. Spivey told one of the treating doctors that the first time he noticed anything was wrong with John was when he left the furniture store at 5:55 p.m. Spivey told the doctor that John had fallen the night of December 6, causing his forehead to swell and bruise.

The officers who responded to Love's call from the furniture store found blood on the pillow in the breakroom and on the mattress, both matching John's DNA profile. The police also matched John's DNA profile to blood found on the nasal aspirator and to blood found on a washcloth and tissues in Spivey's car. Officers found a towel in a bedroom of Spivey and Jane's apartment, which tested positive for blood that matched John's DNA profile. The medical examiner determined that John's cause of death was multiple, recent blunt-force injuries and a skull fracture that radiated from left to right and descended to the base of his skull, "completely cracking the bone open." The medical examiner testified that even with medical attention, the severity of John's skull fracture "would likely be fatal" but that the "prognosis would be very, very poor" if medical attention were delayed.

Spivey was indicted with capital murder, murder, and injury to a child. *See* Tex. Penal Code Ann. §§ 19.02(b)(1), 19.03(a)(8), 22.04(a)(1). The indictment also contained a notice that the State would seek a finding that Spivey used "a hard or soft object or surface" as a deadly weapon during the commission of the offenses. *See id.* § 1.07(a)(17). The State did not seek the death penalty. *See id.* § 12.31(a). At trial but

4

before the trial court read its charge to the jury, the trial court excused juror 44 based on a disability and continued the trial with an eleven-member jury. *See* Tex. Code Crim. Proc. Ann. art. 36.29(a). The jury found Spivey guilty of capital murder and found that he used a deadly weapon during the commission of the offense. The trial court imposed the sentence required by statute: life confinement without the possibility of parole. *See* Tex. Penal Code Ann. § 12.31(a)(2).

Spivey filed a notice of appeal and now asserts that the evidence was insufficient because (1) the State did not fully investigate the case and, thereby, did not exclude every reasonable hypothesis other than Spivey's guilt and (2) his mere presence at the time John was injured is not enough to "corroborate" his guilt. He also argues that the trial court abused its discretion by disqualifying juror 44 and allowing an eleven-member jury to deliberate his guilt.

## II. SUFFICIENCY OF THE EVIDENCE

Federal due process requires that the State prove beyond a reasonable doubt every element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 316 (1979); *see* U.S. Const. amend. XIV. In our due-process review of the evidence, we view all the evidence in the light most favorable to the verdict to determine whether any rational fact-finder could have found the crime's essential elements beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the fact-finder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences

5

from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319; *Queeman*, 520 S.W.3d at 622.

Spivey points to the now-discredited, reasonable-hypothesis theory of sufficiency and argues that because the police did not conduct a meaningful investigation into Jane's possible role in John's death, the State failed to exclude other, reasonable hypotheses of the offense. But the State is not required to exclude all other reasonable theories for the offense in order to sufficiently prove its case. *See Sonnier v. State*, 913 S.W.2d 511, 516 (Tex. Crim. App. 1995); *Crawford v. State*, No. 02-13-00391-CR, 2014 WL 5878112, at *4 (Tex. App.—Fort Worth Nov. 13, 2014, pet. ref'd) (mem. op., not designated for publication). Indeed, circumstantial evidence is as probative as direct evidence in a sufficiency analysis. *See Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015).

Spivey also asserts that because John had older injuries, which could be attributable to Jane's actions or inactions, a proper investigation would have "unquestionably revealed" that Jane was "aware that [John] was being abused and did absolutely nothing." At oral argument, Spivey's counsel characterized these injuries as "horrendous" and "extraordinary in scope and brutality." Spivey then posits that if Jane had been charged with an offense, "she in all likelihood would not have testified against [Spivey] out of fear of self-incrimination or impeachment."

At trial, the medical examiner testified that John had several older injuries at the time of his death: old injuries to his liver, pancreas, and adrenal gland; a healing

6

broken bone in his left wrist; and some scarring on his thigh.[3] She testified, however, that these injuries did not contribute to John's death. John suffered several severe injuries that occurred contemporaneously with the skull fracture: scrapes to the "bony prominence" of his spine and significant bruising on his chest, back, abdomen, the back of his thigh, and his right arm. The medical examiner opined that the bruising was caused by at least five blows and that the skull fracture was the cause of John's death. John's contemporaneous, recent injuries did not match Spivey's report that John had fallen the night before his death. The presence of John's older injuries, which were not the cause of John's death, did not render the evidence insufficient to convict Spivey of John's murder or reveal that the State's investigation was insufficient. *See generally Palmer v. State*, 902 S.W.2d 561, 563 (Tex. App.—Houston [1st Dist.] 1995, no pet.) ("The State has no duty to seek out exculpatory information independently on the defendant's behalf."). Further, an investigating officer testified why his investigation began to focus on Spivey and not Jane: inconsistencies in Spivey's explanation in comparison to the severity of John's injuries and Spivey and Jane's agreement that John was alert, talking, and walking when Jane left the morning of December 7. We overrule issue one.

Spivey next argues that the State did not sufficiently connect Spivey to John's death other than to show that he was present at the time of John's fatal injuries. He

---

[3]The medical examiner opined that these injuries occurred "at least a couple of days and some maybe even a couple of weeks or longer" before the fatal injuries.

points to the fact that John was around "other persons besides [Spivey]" between December 6 and 7, notably Jane.

The medical examiner testified that the effects of John's severe skull fracture would have been immediately apparent, causing him to be either unconscious or very lethargic as his head filled with blood. Such a fracture would also cause changes to breathing and heart rate, leading to death. Certainly, John would not have been able to talk or walk. John showed signs of his injuries only after Jane left for work and only after Spivey gave John a bath. Indeed, a bloody towel was found in Spivey and Jane's apartment, and the blood matched John's DNA profile. When Spivey and John were in the Dollar General store approximately one hour after Jane had left, John was limp and lifeless.

At the time John was injured, Spivey was the only person with him. Contrary to Spivey's argument, "when an adult defendant has had sole access to a child at the time its injuries are sustained, the evidence is sufficient to support a conviction for injury to a child, or murder if the child dies." *Garcia v. State*, 16 S.W.3d 401, 405 (Tex. App.—El Paso 2000, pet. ref'd). But even if Spivey's sole access to John at the time his skull was fractured were considered insufficient standing alone to support his capital-murder conviction, the combined and cumulative force of all the evidence supported his conviction. After Spivey bathed John and suctioned blood out of John's nose and after Sarsfield saw that John was not responsive and was making gurgling sounds, Spivey took John to work with him. Once there, Spivey laid John

8

face-down on a mattress and later on the floor, where John snored loudly and slept the entire day, which was unusual for him. After Spivey and John left the furniture store after approximately eight hours, Love saw that John had bled on the mattress and on the floor, and she immediately cleared the store and called police. By the time John was taken to a hospital, he was cold and could not be resuscitated. This evidence, viewed in the light most favorable to the verdict, is sufficient to support Spivey's conviction. *See, e.g.*, *Washington v. State*, 567 S.W.3d 430, 437–41 (Tex. App.—Houston [14th Dist.] 2018, pet. filed); *West v. State*, No. 10-15-00326-CR, 2018 WL 3580784, at *2–8 (Tex. App.—Waco July 25, 2018, pet. ref'd) (mem. op., not designated for publication); *Crawford*, 2014 WL 5878112, at *4. We overrule issue two.

### III.  DISQUALIFIED JUROR

In his final issue, Spivey argues that the trial court abused its discretion by declaring that juror 44 was disabled based on her husband's emergency medical condition and by allowing an eleven-member jury to deliberate his guilt. He asserts that the trial court instead could have "recessed the trial for a couple of days and then revisited the urgency of the issue" or "verified the urgency of the situation by contacting the doctor treating the juror's husband."

After being informed of a problem with juror 44, the trial judge spoke to her in chambers and discovered that her husband had been taken to the emergency room that morning and that he might require a pacemaker. The trial judge excused juror 44, told the parties that he had determined that juror 44 was disabled, and stated that the

9

trial would proceed with eleven jurors. Neither Spivey nor the State objected to the disqualification of juror 44 or to the trial continuing with eleven jurors.

To preserve his complaints for our review, Spivey was required to make a timely objection. *See* Tex. R. App. P. 33.1; *Quiros v. State*, No. 05-17-00218-CR, 2018 WL 3322934, at *2 (Tex. App.—Dallas July 6, 2018, pet. ref'd) (mem. op., not designated for publication). He did not; therefore, he may not complain of either action on appeal. *See Maten v. State*, 962 S.W.2d 226, 227–28 (Tex. App.—Houston [1st Dist.] 1998, pet. ref'd). We overrule issue three.

## IV. CONCLUSION

We conclude that all of the evidence viewed in a light most favorable to the jury's verdict sufficiently supports Spivey's conviction for the capital murder of John. Not only was Spivey alone with John when he received his fatal injuries, Spivey lay him on a mattress and on the floor, where John continued to bleed and his intercranial pressure steadily increased for the next several hours. Spivey's report of how John was injured did not match the severity of John's actual injuries. Finally, Spivey did not preserve for our review his complaint regarding the disqualification of juror 44. We overrule Spivey's issues and affirm the trial court's judgment.

/s/ Lee Gabriel

Lee Gabriel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  April 25, 2019