**Affirmed and Memorandum Opinion filed February 18, 2021.**



**In The**

# Fourteenth Court of Appeals

### NO. 14-18-01022-CR

**SOSTENES JOEY ADAME, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 239th District Court
Brazoria County, Texas
Trial Court Cause No. 81875-CR**

## MEMORANDUM OPINION

A jury found appellant guilty of the offense of injury to a child enhanced by a prior conviction and sentenced him to thirteen years' confinement with a fine of $5,000. Appellant raises two issues on appeal: (1) the evidence is legally insufficient to support the conviction and (2) the trial court abused its discretion in denying appellant's motion for directed verdict. Finding the evidence legally sufficient and no error in the record, we affirm the trial court's judgment.

## STANDARD OF REVIEW

Because a challenge to the trial court's ruling on a motion for directed verdict is a challenge to the sufficiency of the evidence to support the conviction, we consider appellant's first and second issues together. *See Madden v. State*, 799 S.W.2d 683, 686 (Tex. Crim. App. 1990); *Solomon v. State*, 999 S.W.3d 35, 37 (Tex. App.—Houston [14th Dist.] 1999, no pet.). In a legal sufficiency review, we apply well-established standards. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Garcia v. State*, 57 S.W.3d 436, 441 (Tex. Crim. App. 2001). We determine whether a rational trier of fact could have found the essential elements of the crime were proven beyond a reasonable doubt. *See Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). In making this determination, we consider all evidence the trier of fact was permitted to consider in the light most favorable to the verdict. *Goodwin v. State*, 376 S.W.3d 259, 264 (Tex. App.—Austin 2012, pet. ref'd).

The jury, as the sole judge of credibility of the witnesses, is free to believe or disbelieve all or part of a witness' testimony. *Jones v. State*, 984 S.W.2d 254, 257 (Tex. Crim. App. 1998). The jury may reasonably infer facts from the evidence presented, credit the witness it chooses to, disbelieve any or all of the evidence or testimony proffered, and weigh the evidence as it sees fit. *See Garcia*, 57 S.W.3d at 441. Reconciliation of conflicts in the evidence is within the jury's discretion, and such conflicts alone will not call for reversal if there is enough credible evidence to support a conviction. *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000). An appellate court may not re-evaluate the weight and credibility of the evidence produced at trial and, in so doing, substitute its judgment for that of the fact finder. *Johnson v. State*, 967 S.W.2d 410, 412 (Tex. Crim. App. 1998). Inconsistencies in the evidence are resolved in favor of the verdict. *Curry v. State*,

20 S.W.3d 394, 406 (Tex. Crim. App. 2000). We do not engage in a second evaluation of the weight and credibility of the evidence, but only ensure the jury reached a rational decision. *Muniz v. State*, 851 S.W.2d 238, 246 (Tex. Crim. App. 1993).

## THE EVIDENCE

**A.**

The mother (Mother) of the five-week-old complainant, J.A., was suffering from a severe kidney and urinary tract infection on February 12, 2017. The pain was so great that Mother decided to go to the hospital. Mother and J.A.'s father, appellant, dropped J.A. and Mother's son, D.G., off at Mother's mother's (Maternal Grandmother) home while Mother and appellant went to the hospital. Mother and appellant were at the hospital approximately three hours. Mother was given strong pain medication for her condition.

After the hospital, Mother and appellant went to a restaurant where appellant's stepmother (Stepmother) met them for dinner. While at the restaurant, Maternal Grandmother dropped J.A. off at the restaurant. At the time, J.A. was sleeping and swaddled in her car seat. Mother, Maternal Grandmother, Stepmother, and appellant all testified that they did not notice anything amiss with J.A. at this time. Although, Stepmother and appellant pointed out that they could not have observed if anything were wrong because J.A. was swaddled and sleeping.

The next day, February 13, 2017, Mother was still suffering severe pain from her kidney infection. In addition, Mother was taking her pain medication. Mother also admitted that she smoked marijuana daily. Because of the pain and the medication, Mother was no longer the primary caretaker of J.A., instead appellant had stepped up in taking care of the baby. Neither Mother nor appellant testified as

3

to noticing anything wrong with J.A. on February 13, 2017.

On February 14, 2017, Mother was, again, still in pain from her infection and not the primary caretaker of J.A. Neither Mother nor appellant testified as to noticing anything wrong with J.A. on February 14, 2017. Late in the evening of the 14th or early in the morning of the 15th, Mother awoke to screaming cries from J.A. Mother found J.A. and appellant in the living room. J.A. was lying on a small child's couch with appellant standing over her. Mother asked appellant why J.A. was crying, appellant responded that he did not know. Mother went back to bed. Appellant testified that J.A. would not stop crying and he became frustrated and kicked a toy chest, which may have caused Mother to wake up.

On the morning of February 15, 2017, Mother was changing J.A.'s diaper and noticed that her legs were red. Mother was not overly concerned but noted to herself to "keep an eye on it." Later that day, appellant took J.A. to appellant's grandmother's home (Paternal Grandmother) for a bath, because the couple did not have hot water in their trailer which was located on Paternal Grandmother's property. While at Paternal Grandmother's house, Paternal Grandmother told appellant to take J.A. to the hospital because she believed there was something wrong with J.A. Appellant instead decided to call a pharmacy for help.

The next morning, February 16, 2017, Mother was changing J.A.'s diaper and she noticed that J.A.'s legs were extremely hard and swollen. Mother asked appellant to call Paternal Grandmother for help, as was custom in the family. Paternal Grandmother and appellant's mother came to the door of the trailer and an argument ensued between appellant, Paternal Grandmother, and his mother. Paternal Grandmother eventually made her way into the couple's trailer despite appellant's protests and told Mother that she needed to check J.A. Paternal Grandmother then immediately informed Mother that she was calling 911.

4

When the ambulance and EMS personnel arrived, they found appellant in the trailer holding J.A. City of Pearland Fire Lieutenant Eric Welch testified that appellant "was very defensive about letting us see the child." For Welch, that raised "red flags." Appellant continued to make Welch uncomfortable by interfering with the EMS crew's evaluation of J.A. Appellant would cut Welch off when Welch asked questions about what happened to J.A. Welch testified that Mother was generally withdrawn and did not seem to know what was going on.

The EMS crew determined that J.A. and Mother needed to be transported together in the ambulance to the hospital. Appellant then became argumentative with the EMS personnel and Mother. According to EMS personnel, when appellant saw Mother sitting in the back of the ambulance, he said to her in a direct and aggressive manner that he needed to talk to her. In response to appellant's statement, EMS personnel immediately closed and locked the doors to the vehicle. Paramedic Nathan Kohn testified that after they loaded Mother and J.A. into the ambulance, appellant became very agitated about the EMS crew taking J.A. According to Kohn, appellant told Mother to get out of the ambulance and bring J.A. with her. Kohn testified that appellant's hands were clinched and that he was yelling in Kohn's face.

Mother testified that she believed appellant did not want her and J.A. to go to the hospital. EMS personnel testified that they believed appellant was trying to prevent them from examining J.A. Appellant testified that he was not trying to prevent J.A. from being examined nor from going to the hospital, but that he was concerned about how he and Mother's son, D.G., would get to the hospital since they would not let appellant in the ambulance.

While in the back of the ambulance, EMS personnel questioned Mother about J.A.'s condition. Mother responded that Mother had been sick for the past

5

few days and hadn't been taking care of the baby. According to EMS personnel, Mother's demeanor was surprised and generally unhelpful in regard to J.A.'s condition.

**B.**

Dr. Patricia Beach, a pediatrician at The University of Texas Medical Branch in Galveston, explained that she was the director of the child abuse assessment and treatment program at a center in Galveston. She reviewed x-rays taken of J.A. Dr. Beach testified that there were three fractures, or three areas where the bones had been broken on J.A.'s legs. Specifically, the tips of the bones had been broken off the rest of the bone—Dr. Beach explained that this type of fracture is referred to as a "bucket handle fracture." A bucket handle fracture, Dr. Beach testified, is pathognomonic of child abuse; or as Dr. Beach simplified, abuse is the only explanation for a bucket handle fracture. She testified that these type fractures are the result of a whiplash or shaking type injury and are conclusively not the result of a fall. Furthermore, Dr. Beach explained, it would require an excessive amount of force to cause such an injury, not the type of force encountered in everyday life.

Dr. Beach further testified that J.A.'s clavicle was also fractured. She explained that the clavicle had not begun healing as of the date of the x-ray, therefore, she estimated the fracture to have occurred within the 10 to 14 days preceding the x-ray being taken. According to Dr. Beach, fractures will demonstrate radiographic evidence of healing "about fourteen days" after the fracture. J.A.'s clavicle demonstrated no evidence of healing. Dr. Beach confirmed that, based on her training and experience, she believed that a clavicle fracture, like J.A.'s, could be caused from pressure during squeezing in a "shaking episode."

Dr. Beach also reviewed photos of J.A.'s body which showed darkened

6

areas on her back and buttocks. From the initial photos, Dr. Beach could not determine whether the areas were bruises or dermal melanocytosis, commonly known as Mongolian spots. Two weeks later, the areas on her back had faded, but the areas on her buttocks remained. Dr. Beach determined that the darkened areas she initially observed on J.A.'s back were bruises, while the darkened area on her buttocks were Mongolian spots. The pattern of the bruising, Dr. Beach testified, was consistent with a squeezing and shaking type incident. When questioned whether, given the overall pattern of the injuries as a whole, including the bucket handle fractures, fractured clavicles, and bruising, could be the result of a single shaking episode, Dr. Beach replied that she was "very comfortable" with that conclusion.

Maylin Gerardo-Lopez, a nurse practitioner at the University of Texas Medical Branch in the pediatrics division testified that she works as a pediatric child abuse specialist. Gerardo-Lopez explained that she examined J.A. on February 23, 2017 at the Child Advocacy Center in Galveston. In reviewing photographs taken of J.A. on the 23rd, Gerardo-Lopez explained that bruising found on J.A.'s back was consistent with "pattern bruising" or "handprint bruising" that can occur where finger pads hit or slap a child or baby's body.

Next, Gerardo-Lopez reviewed x-rays of J.A., which Gerardo-Lopez testified were also taken on February 23rd. Gerardo-Lopez testified that the chest x-ray showed a broken clavicle and that there was a section of the ribs that were suspicious for a possible break or fracture. Regarding the clavicle, Gerardo-Lopez explained that in a small infant like J.A., often the clavicle can be fractured by the pressure of an adult thumb when they are holding the child under the armpits.

As to J.A.'s legs, Gerardo-Lopez testified that J.A. had breaks on the corners of the growth plates on both sides of her legs. She explained that these types of

breaks typically occur from a shearing type motion or an "up-and-down motion or a side-to-side motion . . . basically movement that's of rigorous activity."

Finally, Gerardo-Lopez testified as to follow-up radiology that was taken on March 2, 2017 of J.A.'s chest which demonstrated evidence of healing of J.A.'s clavicle and ribs. Although Gerardo-Lopez could determine that healing had begun at this point in time, she testified that she was unable to pinpoint when the injuries had occurred, or even give outside parameters.

## C.

During an initial interview with Detective Eric Morton of the Pearland Police Department, appellant told the detective that he and Mother had gotten into an argument and Mother accidently pulled a comforter off the bed upon which J.A. was lying, resulting in J.A. falling onto the floor. Appellant told Morton this happened two days before J.A. was taken to the hospital.

The jury viewed a video of a second interview on February 21, 2017 between Detective Morton and appellant. During this interview, while appellant was explaining the argument he had with Mother, appellant said to Morton, "she knows, she knows I have an anger problem." Appellant focused on J.A.'s fall as the cause of her injuries. When explaining the argument and subsequent fall, appellant said he blacked out after J.A. fell and could not say whether he or Mother may have fallen on or hurt J.A. further after she fell.

During the interview, appellant told Detective Morton that he took J.A. to Paternal Grandmother's house the day after she fell off the bed. While he was there, he told his mother and Paternal Grandmother about the argument and J.A.'s fall. Because J.A. was crying an inordinate amount, appellant's mother took J.A.'s temperature and they discovered she had a low-grade fever. Appellant said he then

called the pharmacy to see what he could give J.A. to relieve the fever. During this visit, appellant gave J.A. a bath. Appellant told Detective Morton that J.A.'s legs felt stiff and that she would cry whenever he would touch her legs or her shoulders. Appellant said this was especially unusual for J.A. because she loved baths. Appellant said J.A. continued to cry all evening. Appellant explained he took J.A. into the living room in the middle of the night because she would not stop crying and Mother was not being helpful. Appellant said he placed J.A. on a small couch and covered her with a blanket to soothe her. At some point he kicked a toy box out of frustration and Mother came into the living room. Appellant explained that he felt overwhelmed and angry the next day when his mother and Paternal Grandmother came to the trailer and started telling him that he had to call 911.

Mother also testified regarding J.A.'s fall, but according to her, it occurred a week before Mother went to the hospital for her kidney and urinary tract infections. When confronted with Mother's alternate timeline during his interview with Detective Morton, appellant steadfastly denied this version of events. Mother testified that J.A. had no significant reaction to falling off the bed.

When questioned by Special Investigator Cesar Beltran with the Department of Family and Protective Services, appellant told him a similar story about the argument with Mother and J.A. falling off the bed. Appellant stated that it had occurred "a couple days prior to the day that the baby went to the hospital." According to Special Investigator Beltran, appellant told him that the argument between him Paternal Grandmother occurred when they showed up at his trailer because he did not want them there telling him what to do. Appellant said he wanted to make his own decision. Beltran testified that this statement coincided with that of Paternal Grandmother's. Beltran asked appellant specifically about the night of February 14th and/or the early morning hours of February 15th. In

9

response, appellant explained that J.A. was crying excessively, and appellant became frustrated because Mother wasn't helping. Appellant walked J.A. out into the living room to calm her where he kicked a toy box out of frustration. Appellant said Mother came into the living room after he kicked the toy box.

## ANALYSIS

A person commits the offense of third-degree injury to a child if he intentionally or knowingly causes bodily injury to a child under 14 by act or omission. Tex. Penal Code § 22.04(a)(3), (c)(1), (f).[1] Appellant contends the State failed to introduce evidence that would show he engaged in the conduct necessary to cause J.A.'s injuries.

The State was required to prove that appellant intentionally or knowingly caused bodily injury to J.A. Because the jury could have found appellant guilty based on either of these culpable mental states, we need only address the less-culpable mental state of "knowingly." *See Howard v. State*, 333 S.W.3d 137, 139 (Tex. Crim. App. 2011). Under the penal code, a person acts knowingly with respect to the result of his conduct when he is aware that his conduct is reasonably certain to cause the result. Tex. Penal Code § 6.03(b).

"Injury to a child is a result-orientated offense requiring a mental state that relates not to the specific conduct but to the result of that conduct." *Williams*, 235 S.W.3d at 750. Proof of a culpable mental state almost always depends on

---

[1] After abandoning several paragraphs of its indictment upon the close of the State's case, the jury was left to consider the following manners and means of causing bodily injury: (1) shaking J.A.'s leg; (2) causing trauma to J.A.'s leg through unknown manner and means; (3) grabbing J.A.'s upper body with appellant's hand; (4) applying physical force to J.A.'s upper body with appellant's hand; (5) applying physical force to J.A. with an unknown object; (6) shaking J.A.'s upper body; (7) causing trauma to J.A.'s upper body through unknown manner and means; and (8) failing to seek and/or provide timely medical care for J.A. after appellant had assumed care, custody or control of J.A..

circumstantial evidence and intent may be inferred from a defendant's acts, words, and conduct. *Darkins v. State*, 430 S.W.3d 559, 565 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd); *Martin v. State*, 256 S.W.3d 246, 263 (Tex. App.—Houston [14th Dist.] 2007, no pet.). Mental culpability may also be inferred from the extent of the injuries and the relative size and strength of the parties. *Kelley v. State*, 187 S.W.3d 761, 763 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd). The extent of a victim's injuries thus can be a reflection of the strength of a defendant's attack. *Id*.

The expert testimony of both Gerardo-Lopez and Dr. Beach provided evidence that J.A.'s injuries were caused by intentional or knowing actions. Specifically, Dr. Beach testified that it was likely all of J.A.'s injuries resulted from a single shaking incident. The combination of the (1) bucket handle type fractures, which Dr. Beach explained are pathognomonic of child abuse, (2) the broken clavicle, which Dr. Beach opined could have resulted from squeezing, and (3) the finger bruising, which Dr. Beach testified was consistent with that of a violent shaking episode could have led a rational juror to reasonably conclude that J.A.'s injuries were caused in a knowing manner. *See Martinez v. State*, 468 S.W.3d 711, 714-16 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (sufficient evidence of intentional or knowing injury to a child where child's doctor testified child's injuries were consistent with "non-accidental trauma"). The type and severity of J.A.'s injuries support an inference that they were caused intentionally and knowingly. *See id* (citing *Herrera v. State*, 367 S.W.3d 762, 771 (Tex. App.—Houston [14th Dist.] 2012, no pet.)).

Appellant further argues that the State failed to produce any evidence showing action on the part of appellant that would have caused J.A.'s injuries. Dr. Beach explained that the injuries occurred within 10 to 14 days before the x-ray

photographs were taken. Dr. Beach was unable to recall the exact date of the x-rays she reviewed, however, she testified that they were taken between February 20 – 23, 2017. Gerardo-Lopez testified that there were x-rays taken on February 23, 2017. Therefore, the jury could have concluded that the injuries to J.A. must have occurred sometime between February 6 and February 16, 2017–the date she was taken to the hospital. The jury instructions charged jurors with finding that appellant caused the injuries to J.A. on or about the 15th of February.

Evidence produced at trial demonstrated that the first indication that something was wrong with J.A. was Mother's testimony that J.A.'s legs were red the morning of February 15, 2020. Father's story also supports this timeline as he too said there was nothing amiss with J.A. until he took her for a bath at Paternal Grandmother's house on the 15th.

Given the above evidence, a reasonable juror could have concluded that the injuries to J.A. occurred sometime late in the evening of February 14 or early in the morning of February 15, 2017. *See Washington v. State*, 567 S.W.3d 430, 437 (Tex. App.—Houston [14th Dist.] 2018, pet. ref'd) ("pinpoint precision is not required so long as the evidence reasonably narrows the means and manner and potential time frame of injury"). All evidence presented showed appellant and Mother were the only two adults with J.A. at this time. Mother and appellant both have testified that Mother was very ill and mostly bedridden at this time. Mother and appellant both also testified that appellant was alone and frustrated with J.A. in the middle of the night. The jury could have concluded that the stress of caring for a five-week-old baby could have driven appellant, who admitted to, and demonstrated, having anger issues, to injure J.A. *See Earls v. State*, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986) (identity of a perpetrator can be proven by circumstantial evidence); *Martin v. State*, 246 S.W.3d 246, 262 (Tex. App.—

12

Houston [14th Dist.] 2007, no pet.) (sufficient circumstantial evidence in capital murder of a 10-month-old child where appellant failed to call 911, witness testimony regarding appellant's behavior around ambulance, appellant's inconsistent stories, and appellant's testimony that child's cries got on appellant's nerves).

Finally, attempts to hide or conceal evidence, inconsistent statements, and implausible explanations are probative of wrongful conducts and provide circumstances of guilt. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) (lies and implausible explanations are probative of wrongful conduct and are circumstances of guilt). Appellant failed to call 911 when directed by Paternal Grandmother; appellant attempted to prevent Paternal Grandmother from checking-in on J.A.; appellant attempted to prevent EMS personnel from examining J.A.; and appellant attempted to prevent EMS personnel from transporting J.A. to the hospital. Appellant's explanation for J.A.'s injuries is medically implausible as Dr. Beach confirmed that the injuries were conclusively not the result of a fall. Appellant and Mother provided different timeframes for when the argument and subsequent fall occurred. Based on all of this evidence, the jury could have reasonably inferred that appellant was attempting to conceal his guilt. *See id*; *Lozano v. State*, 359 S.W.3d 790, 815 (Tex. App.—Fort Worth 2012, no pet.) (litany of lies in attempt to conceal murder was probative of guilt); *Martin*, 246 S.W.3d at 262.

When viewing all the evidence in the light most favorable to the verdict, we find the evidence is sufficient to permit a rational jury to find the elements of the offense beyond a reasonable doubt. *See Salinas v. State*, 163 S.W.3d 734, 737 (Tex. Crim. App. 2007). Accordingly, we overrule both of appellant's issues.

**CONCLUSION**

We affirm the judgment of the trial court.


/s/ Ken Wise
   Justice


Panel consists of Chief Justice Christopher and Justices Wise and Zimmerer.

Do Not Publish — Tex. R. App. P. 47.2(b)